No. 35,668

NETTIE G. HICKEY, *Appellee,* v. FOX-OZARK THEATRES CORPORATION, *Appellant.*

(131 P. 2d 671)

Opinion filed December 12, 1942.

*J. B. Patterson,* of Wichita, argued the cause, and *A. W. Hershberger, Enos E. Hook, Patrick J. Warnick, R. E. Kirkpatrick* and *Richard Jones,* all of Wichita, were on the briefs of the appellant.

*Arnold C. Todd,* of Wichita, argued the cause, and *L. J. Bond,* of El Dorado, and *Kurt Riesen,* of Wichita, were on the briefs of the appellee.

The opinion of the court was delivered by

HOCH, J: Plaintiff was injured in a fall on the stairs at a theater, and recovered damages against the owner and operater of the theater. The defendant appeals.

The plaintiff, a resident of El Dorado, alleged in her petition that she attended a show at the "El Dorado Theatre" on May 29, 1940, and took a seat in the balcony; that the stairway. to the balcony was poorly lighted and had no handrail on the east or left-hand side going down; that after seeing the show she started down the stairway, and when part way down some boys, patrons of the theater, rushed down the stairway, ran into her and caused her to fall and suffer severe injuries. She alleged that her injuries resulted from

negligence of the defendant in failing to provide the stairway with handrails, in failing to have the stairway properly lighted, and in failing "to guard and protect patrons of said theater from being pushed or otherwise endangered by the patrons of the theater." She asked damages in the sum of $2,500 for personal injuries and for $278.96 for expenses for hospital, doctor bills, etc. The answer consisted of a general denial and an allegation that if the plaintiff suffered injuries they were caused by her own negligence. Trial was had and the jury returned a verdict for the plaintiff for $1,543.96 and answered special questions.

The principal contentions urged by appellant are that the court erred in refusing to permit certain questions asked on cross-examination, in overruling its demurrer to the evidence and in overruling the motion for judgment notwithstanding the general verdict.

We shall consider first the demurrer to the evidence. Plaintiff testified, in substance, that she had lived in El Dorado since 1923; that she had attended the El Dorado Theatre from time to time and had been up and down the stairway to the balcony several times— "quite often"—before the accident; that on the day in question she and a friend, Mrs. Lehr, visited the show in the evening, getting there during the first evening show; that when the picture reached the point "where they came in" she and her friend started to leave the theater and started down the stairway; that there was no one else on the stairway as they descended; that there was a handrail on the right-hand side but that she was beside Mrs. Lehr and coming down the left-hand side of the stairway, with her hand sliding along a broad banister which was on the left-hand side; that the stairway was rather wide and pretty steep, with heavy carpet; that when they were about half way down a boy came rushing down the stair and ran into her and gave her such a shove that she couldn't catch herself; that she tried to grab the rail but that there was no handrail on that side, but "just a big board," "a broad banister," and she couldn't get hold of it; that the stairway was dimly lighted but that she could see where she was stepping; that if the stairway had been better lighted she might have been able to see the steps more plainly and might have been able to "hit the steps in a manner" that she "wouldn't have gone on down"; that "under ordinary circumstances there would have been sufficient lighting"; that there was just the usual crowd and "not a lot of people crowding out at that time"; that there were two boys, and possibly more who came

down the stairway; that she didn't think she would have fallen if the boy hadn't run into her "with a good deal of force." We need not recite the testimony as to the nature and extent of her injuries.

Mrs. Lehr's testimony was substantially the same as that of the plaintiff. She testified that she and Mrs. Hickey were coming down the stairs together, walking side by side; that there was no crowd milling up and down or on the stairway behind them and she did not notice any school children in the hallway at that time; that as far as she knew the only people on the stairway when the accident occurred were Mrs. Hickey, herself and the two boys; that she heard a noise but before she could turn around to see what it was, the boy, coming down the stairs rapidly, pushed Mrs. Hickey and that she attempted to grab her but couldn't; that in her judgment the boys were ten or twelve years old; that the banister would have been sufficient if Mrs. Hickey hadn't been struck by the boy; that the banister was too wide to get a grip on it. She further testified that within six months prior to the accident she had "seen children run up and down stairs when there is a crowd"; and over objection of counsel for defendant was permitted to testify: "I had one occasion to hesitate going down stairs. Kids were in a hurry, pushing pell mell. They do hurry down stairs. This occasion was five years before May, 1940."

Mrs. Thilion testified that she had been to this theater often and was familiar with the stairway and that on more than one occasion spread over several years she had seen children run down the stairway—"just running and hurrying to get out like children would."

Eugene Brown, nineteen years old, testified that he had attended the theater since he was five or six years old and had frequently seen boys run up and down the stairs; that "the boys would take two or three steps at a time and kind of brush people aside to try to get up or down in a hurry. Sort of a race. Would run into people on the stairway. When I was younger I remember running up and down on more than one occasion. About every Saturday afternoon, I used to go and run up and down stairs. *That was three or four years prior to May of 1940.* I got over that habit. Employees saw me but never called me down that I remember of"; that it wasn't very long before May 29, 1940, when he saw people running up and down.

Robert Lehr, eighteen years old, testified that he had seen boys trying "to take as many steps as they can," and he had done that

a good many times and that "they do when there are older people on the stairs. I don't remember any of the employees of the theater saying anything to me about it. I have brushed against other patrons."

Everett Shearburn, eighteen years old, testified that he had "seen other boys going up and down the stairs" and "I used to run up and down myself, you know. I always ran up and ran down, too, when me and some of the boys got together. We tried to watch out for other patrons on the stairs. I remember getting called down by employees of the theater. I don't know whether it was going down stairs or whether I had my feet in the seat, or something, but I remember once or twice I got called down."

John Lehr, sixteen years old, testified:

"I ran up and down the stairs and have seen other boys do so. Even when other patrons were using the stairs. The employees of the theater did not remonstrate with me. There are usually ushers and other employees of the theater about the lobby."

Richard Lehr, seventeen years old, testified that he had gone up and down the stairs at "a pretty good rate of speed"; had seen other boys do the same and that "one of the ushers slowed me down once."

W. R. Powell, witness for plaintiff, testified:

"For a number of years I was manager of the El Dorado Theatre. I know Mrs. Hickey and was at the theater on the evening of May 29, 1940, when Mrs. Hickey fell. I saw her after the fall. Previous to May 29th, as manager of the theater, *I had had trouble with boys running up and down those stairs a good many times. We tried to prevent it practically every time it happened but it was one of those things that couldn't be helped.* We tried to stop it because of various unnecessary noises and things they would make when they would run up and down stairs. *The ushers, the door boys and all were cautioned to look out for that very thing and they tried. In fact, they would stop it when they were there but various times they would be busy other places and couldn't be there at that time.* . . . This running up and down would occur mostly of an evening or Saturday when there wasn't any school. The night this accident occurred was Wednesday. There was what I would call a fair crowd in the theater. The house was between a third and a half full. I did not expect any particular commotion of rowdyism during the middle of the picture when Mrs. Hickey left.

"Q. *You took every precaution you thought was possible to stop such rowdyism, did you not? A. Yes, we did.* There were four employees in attendance at the theater, an upstairs usher, a downstairs usher, the doorman and myself. When we have any reason to anticipate there might be group of boys rushing up and down stairs, we would have someone there to stop them as a rule. As to whether I would anticipate anybody running up and down

stairs when the feature picture was going on, I would have to answer both ways. Various times kiddies would run up and down stairs on account of the drinking fountain was downstairs and the children always want to go up to the balcony, and if they were upstairs they want to go downstairs, and if they are downstairs they want to go upstairs. When I was manager, I had trouble with some of the larger boys. At one time I had to bar the football team and they threw eggs at me afterwards.

"Q. You took every precaution you thought reasonable or that you reasonably could to prevent running up and down and that sort of thing?

"Mr. Bond: Objected to as calling for a conclusion.

"Overruled.

"A. Yes, sir.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"I was present in the theater at the time the accident occurred. I was in the office upstairs.

"Q. There was no commotion of any kind that was called to your attention until after it was over? A. There was not.

"Q. There hadn't been any noise or anything that attracted your attention? A. Not that I noticed.

"Q. If the upstairs usher had been standing near the head of the stairs when this boy started running down, he could have easily prevented it, couldn't he? A. He could have; yes, sir.

"Q. All right, will you tell me how? A. I say prevent it. *He could do the best he could to stop it, that's all.*

"Q. He could have taken the same precaution you tried to take before, is that it? A. Yes, sir."

The general rule is well established that proprietors of places of public entertainment or amusement are not insurers of their patrons against injury, but are only chargeable with the exercise of what under the particular circumstances is ordinary or reasonable care. This question was considered in our recent case of *Klish v. Alaskan Amusement Co.*, 153 Kan. 93, 109 P. 2d 75. Much of what was there said is pertinent here and need not be repeated. (Also see authorities there cited.)

Let us briefly summarize this testimony. The plaintiff had attended this theater many times and was entirely familiar with the stairway and with other conditions existing; the fact that children at times ran up and down the stairway—as children will—was common knowledge; the boy who struck her was a patron and not an employee of the theater; there was no showing of any facts or circumstances which would put the management or employees on notice that boys were likely to be running down the stairs at the time here involved—the evidence was to the contrary; no children were seen in the hallway before plaintiff started to descend; there was no

evidence that sufficient attendants were not provided to give the reasonably necessary attention to patrons or that any attendant was derelict in his duty by not being at the head of the stairway at the time the boys started down or that he could have stopped them from running on the stairs; the manager, witness for the plaintiff, testified that he had taken what precautions he could to prevent children running about the theater and that there hadn't been any noise that attracted his attention, and that he did not expect any commotion or rowdyism during the middle of the picture when the plaintiff left; there was no evidence that anyone had ever been hurt before by children running into other patrons; plaintiff chose to descend on the left-hand side of the stairway where there was a banister instead of on the right-hand side where there was a smaller handrail, and the stairway was sufficiently lighted so that she had no trouble seeing the steps. Viewing this testimony in the light most favorable to the plaintiff, we must conclude that it constituted no cause of action against the defendant—no facts and circum-- stances which would justify a finding of actionable negligence. It follows that the court erred in overruling defendant's demurrer to the evidence.

Ordinarily a question of negligence is one for the jury, but where, upon the undisputed testimony, no facts or circumstances are shown which, in the minds of reasonable men, can be said to constitute a cause of action, based on negligence, it becomes a question of law to be determined by the court, when the sufficiency of such evidence is properly challenged. '(*Smith v. Mead Construction Co.*, 129 Kan. 229, 233, 282 Pac. 708; *Cleghorn v. Thompson*, 62 Kan. 727, 733, 62 Pac. 605.)

The conclusion already stated makes it unnecessary to consider the other assignments of error.

The judgment is reversed with directions to enter judgment for the defendant.